

Magistrate Judge Strombom

1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
9                  AT TACOMA

10  UNITED STATES OF AMERICA,        )    MAGISTRATE'S DOCKET NO.
                                     )    MJ12-5026 KLS
11              Plaintiff,           )
                                     )    COMPLAINT for VIOLATIONS
12          v.                       )    of Title 21, United States Code, Sections
                                     )    841(a)(1) and 846, and Title 18, U.S.C.,
13                                   )    Sections 922(g)(1) and (g)(5)(A)
    JAVIER HERNANDEZ-GODINEZ,         )
14  JORGE HERNANDEZ-GODINEZ,          )
    "JOHN DOE," a/k/a "RAUL,"         )
15  JESUS ENRIQUE PALOMERA, and       )
    AMBER YEHLE,                      )
16                                   )
                Defendants.          )
17  _____ )

18
    BEFORE, KAREN L. STROMBOM, United States Magistrate Judge, Tacoma, Washington.
19
    The undersigned complainant, Lisa Sanks, Special Agent, Bureau of Alcohol, Tobacco,
20  Firearms, and Explosives, being duly sworn, states:

21

22                          **COUNT ONE**

23              **(Conspiracy to Distribute Methamphetamine)**

24        Beginning at a time unknown, but within the last five years, in Tacoma, within the

25  Western District of Washington, and elsewhere, JOHN DOE, a/k/a "RAUL," JAVIER

26  HERNANDEZ-GODINEZ, and others known and unknown, knowingly and intentionally

27  conspired to distribute methamphetamine, a controlled substance.

28        It is further alleged that the offense involved fifty grams or more of a mixture or

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  substance containing methamphetamine, its salts, isomers, or salts of its isomers.

2         All in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B), and

3  846.

4

5  **COUNT 2**

6  **(Alien in Possession of a Firearm)**

7         On or about September 7, 2011, in Tacoma, within the Western District of Washington,

8  and elsewhere, JAVIER HERNANDEZ-GODINEZ and JORGE HERNANDEZ-GODINEZ,

9  each then being an alien illegally and unlawfully in the United States, did knowingly possess in

10  and affecting interstate and foreign commerce one or more of the following firearms: a Colt

11  Woodsman .22 caliber pistol bearing serial number 082301S; a Smith & Wesson .38 Special

12  caliber revolver bearing serial number D669542; two Glock Model 22 .40 caliber pistols bearing

13  serial numbers EHF563US and EHF253US; and a Smith & Wesson Model 469, 9mm caliber

14  pistol bearing serial number TAA0994, all of which had been shipped and transported in

15  interstate and/or foreign commerce.

16         All in violation of Title 18, United States Code, Section 922(g)(5)(A).

17

18  **COUNT 3**

19  **(Alien in Possession of a Firearm)**

20         On or about November 16, 2011, in Tacoma, within the Western District of Washington,

21  and elsewhere, JESUS ENRIQUE PALOMERA, then being an alien illegally and unlawfully in

22  the United States, did knowingly possess in and affecting interstate and foreign commerce, a

23  firearm, to wit, a PWA, .556 caliber, model Commando, assault rifle, bearing serial number

24  13733, which had been shipped and transported in interstate and/or foreign commerce.

25         All in violation of Title 18, United States Code, Section 922(g)(5)(A).

26

27

28

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1

**COUNT 4**

2

**(Alien in Possession of Ammunition)**

3      On or about November 16, 2011, in Tacoma, within the Western District of Washington,

4  and elsewhere, JORGE HERNANDEZ-GODINEZ, then being an alien illegally and unlawfully

5  in the United States, did knowingly possess in and affecting interstate and foreign commerce,

6  ammunition, to wit, Remington .380 auto ammunition which had been shipped and transported

7  in interstate and/or foreign commerce.

8      All in violation of Title 18, United States Code, Section 922(g)(5)(A).

9

10

**COUNT FIVE**

11

**(Felon in Possession of a Firearm)**

12      On or about November 16, 2011, in Tacoma, Washington, within the Western District of

13  Washington, and elsewhere, AMBER YEHLE, having previously been convicted of *Unlawful*

14  *Possession of a Controlled Substance -- Methamphetamine*, in the Superior Court of Washington

15  for Pierce County, on or about February 23, 2009, cause 08-0-06043-0, a crime punishable by

16  imprisonment for a term exceeding one year, did knowingly possess, in and affecting interstate

17  and foreign commerce, one or more of the following firearms: a Marlin, Model 60, .22 caliber

18  rifle, bearing serial number 06225356; a Mossberg, model 500A 12 gauge, pump-action shotgun,

19  bearing serial number K865680; a Mossberg, model 500A 12 gauge, pump-action shotgun,

20  bearing serial number J371412; a Bushmaster, model Carbon 15, .556 caliber pistol, bearing

21  serial number D05977; and a Ruger, .22 caliber, model 10/22 Carbine, semi-automatic rifle,

22  bearing serial number 232-0835 , all of which had been shipped and transported in interstate

23  and/or foreign commerce.

24      All in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

25      And the complainant states that this Complaint is based on the following information:

26

**Background**

27      1.      I am a Special Agent with the Seattle Division of the Bureau of Alcohol, Tobacco,

28  Firearms and Explosives ("ATF").  I am assigned to the ATF Violent Gang Task Force and I

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   mostly investigate violent gang members and associates in the Seattle area.  I have been

2   employed as an ATF Special Agent since July 12, 2004, and am a graduate of the Federal Law

3   Enforcement Training Center's Criminal Investigator Training Program and the ATF National

4   Academy's Special Agent Basic Training. Since I have been employed by ATF, I have been

5   trained to investigate and recognize Federal firearms, narcotics, explosives and arson violations.

6   As a result of my training I have been familiarized with investigations of firearm/drug trafficking

7   organizations, methods of importation and distribution of controlled substances, and financial

8   investigations.  In addition, I have participated in numerous complex investigations, and

9   participated in numerous arrests and search warrants.  I am also a certified interstate nexus

10  expert with extensive training and experience in determining where firearms were made and

11  whether they have traveled in interstate commerce.

12          2.       The information contained in this Complaint is based on information provided to

13  me by other law enforcement officials and my own investigation.

14                                      **The Investigation**

15          3.       This case emerged out of an investigation into an organization that was selling

16  methamphetamine and firearms in California and Colorado.  I have learned about that

17  investigation from the agents who worked on it.  One of the targets of that investigation was a

18  California man known only as "Carlos."  An undercover agent, working with an informant[1],

19  bought several firearms and roughly half a pound of methamphetamine from Carlos.  The

20  informant asked Carlos about buying hand grenades.  Carlos said that he had associates in

21  Phoenix and Tacoma who could sell grenades and automatic weapons.

22          4.       Carlos put the informant in touch with JOHN DOE, a man known only as RAUL.

23  I will refer to JOHN DOE as RAUL throughout this Affidavit.

24          The September 2, 2011, Meeting With RAUL and JAVIER HERNANDEZ-GODINEZ

25          5.       On the evening of Friday, September 2, 2011, an undercover agent (the "UC") and

26  the informant met with "RAUL" and another man who introduced himself as "JAVIER."  The

27  _____

28          [1] The informant has criminal history.  As far as I know, the informant has no convictions for
perjury, false statements, or similar crimes of dishonesty.  The informant has been paid for his work in
this case.

Complaint/HERNANDEZ-GODINEZ et al. - 4

1 | UC and the informant both later saw a driver's license photo of JAVIER HERNANDEZ-
2 | GODINEZ and both identified him as "JAVIER." The purpose of the meeting, which had been
3 | arranged by Carlos, was to discuss future illegal sales of firearms and narcotics. The informant
4 | spoke to Carlos by phone repeatedly before the meeting, and the informant reported that Carlos
5 | told him[2] that he was consistently making calls to RAUL and JAVIER.

6 |     6.    The meeting took place in the parking lot of a La Quinta hotel on the corner of
7 | Portland Avenue and East 27th Street in Tacoma, Washington. The meeting was recorded.
8 | RAUL and JAVIER HERNANDEZ-GODINEZ drove into the parking lot in a dark grey 2001
9 | Chevrolet Suburban, Washington license plate number, AFT9501. An unknown Hispanic man
10 | was in the car with them. My investigation has shown that the Suburban is registered to
11 | JAVIER HERNANDEZ-GODINEZ.

12 |     7.    RAUL and JAVIER HERNANDEZ-GODINEZ got out of the Suburban to meet
13 | with the UC and the informant. The unknown Hispanic man stayed in the car. RAUL is a short
14 | Hispanic man with a medium build. He appears to be in his mid to late forties. He has short
15 | black hair and a black moustache. RAUL and JAVIER HERNANDEZ-GODINEZ introduced
16 | themselves by their first names. The conversation mostly took place between the informant and
17 | RAUL in Spanish. The informant and JAVIER HERNANDEZ-GODINEZ translated important
18 | parts of the conversation into English for the UC.

19 |     8.    RAUL stated that he sold methamphetamine, but that he did not sell less than
20 | pound quantities. RAUL said that he sold the methamphetamine for $11,500 per pound. RAUL
21 | showed the UC a list and said, through JAVIER  HERNANDEZ-GODINEZ, that he had ten
22 | guns to sell for $7,500. RAUL said that the guns were two fully-automatic machine guns, a .308
23 | caliber rifle, an AK-47 assault rifle, an SKS assault rifle, .40 caliber pistols, and 9mm pistols.
24 | RAUL told the UC, through the informant, that he could get the UC whatever he wanted, and
25 | that the UC should make him a list of what he needed. The UC walked RAUL to his vehicle and
26 | pulled out $7,500.00 and showed the money to RAUL. The UC asked RAUL if they could do

27 |

28 |     [2] Per standard practice, I will refer to the UC and the informant as if they were men, regardless of
their real gender.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    the deal that night. RAUL said that it would have to be the next day. The UC and RAUL then

2    rejoined the informant and JAVIER HERNANDEZ-GODINEZ. All agreed to meet the next

3    afternoon. JAVIER HERNANDEZ-GODINEZ told the UC that he would talk to the UC

4    directly over the phone since his English was better than RAUL's.

5            The September 6, 2011, Purchase Of A Pistol And Methamphetamine From RAUL

6            9.      According to the informant, on September 6, 2011, at roughly 10:00 a.m., the

7    informant talked with RAUL by phone and arranged a meeting for 4:00 p.m. that day. RAUL

8    was supposed to deliver two long guns, four or five pistols, and one ounce of "crank" or

9    methamphetamine.

10           10.     At some point, the conspirators stated that they would not be able to sell the batch

11   of six to seven guns until the following day. However, the conspirators were able to sell a single

12   handgun on September 6th. JAVIER HERNANDEZ-GODINEZ called the informant from

13   phone number 662-306-0068. JAVIER HERNANDEZ-GODINEZ asked the informant if the

14   UC wanted to buy a gold Desert Eagle .50 caliber pistol for $1,500. RAUL sent the informant a

15   picture of the Desert Eagle by text message. At the UC's direction, the informant told RAUL

16   that the UC wanted the firearm, and that he also also wanted an ounce of methamphetamine as a

17   sample. According to the informant, RAUL then told the informant that he would sell the UC

18   the Desert Eagle for $1,500 and an ounce of methamphetamine for $700.

19           11.     At rougly 4:10 p.m. on September 6th, RAUL, JAVIER HERNANDEZ-

20   GODINEZ, and an unknown Hispanic male in his mid-thirties with a thin build, bushy black hair

21   and a black moustache, pulled into the parking lot of the La Quinta hotel in Tacoma to meet the

22   UC and the informant. The conspirators were riding in JAVIER HERNANDEZ-GODINEZ's

23   2001 Suburban. The conspirators parked next to where the UC and the informant were parked.

24   RAUL and JAVIER HERNANDEZ-GODINEZ got out of the Suburban and met with the UC

25   and the informant.

26           12.     In the UC's presence, RAUL put a substance wrapped in green plastic into the

27   informant's pocket. The informant handed the substance to the UC. The substance weighed

28   30.3 gross grams (with packaging) and field-tested positive for methamphetamine.

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

13.     JAVIER HERNANDEZ-GODINEZ told the UC that the firearm was in the back of the Suburban.  The UC opened the rear passenger's side door and the unknown man produced the .50 caliber Desert Eagle, which was in a case with two magazines, one of which was loaded.  The unknown man said that the gun was brand new and came from Anaheim.  The UC asked the unknown man who he should pay for the gun.  The unknown man motioned towards RAUL.  The UC then paid RAUL $2,200 for the gun and the methamphetamine.

14.     The UC and RAUL then discussed future deals.  RAUL said that he had two fully-automatic AK-47 rifles, an SKS assault rifle, and handguns for sale.  RAUL said that he had to get the guns from a "white lady" who lived nearby.  RAUL would not give the UC a price on the guns until he spoke with the "white lady."  The UC asked RAUL what he could get him that day.  RAUL said that they would go to the white lady's house immediately to find out.  The conversation then turned to methamphetamine.  The UC asked RAUL if he would lower his minimum quantity to a half a pound.  RAUL asked the UC if wanted a quarter pound immediately.  The UC and RAUL negotiated a price for $2,800 for the quarter pound and the meeting ended.

15.     The three conspirators drove off in the Suburban.  ATF Task Force Officer ("TFO") Michael Garske followed the Suburban, which went to a house at 831 E. 47th Street, Tacoma, Washington.  JAVIER HERNANDEZ-GODINEZ lists this house as his address on his driver's license.

16.     The UC and the informant met with RAUL and JAVIER HERNANDEZ-GODINEZ for a second time on September 6th to conduct the quarter pound of methamphetamine sale.  At roughly 6:20 p.m., JAVIER HERNANDEZ-GODINEZ and RAUL arrived at the La Quinta hotel in the 2001 Suburban to meet with the UC and the informant.  RAUL got out of the Suburban and motioned for the UC to get into the car.  The UC then got into the rear passenger side of the vehicle and JAVIER HERNANDEZ-GODINEZ handed him a substance wrapped in the same type of green plastic wrap that the previous ounce of methamphetamine was wrapped in.  The substance weighed 118.5 gross grams and field-tested positive for methamphetamine.  The UC paid JAVIER HERNANDEZ-GODINEZ $3,000 and

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   got out of the car.

2       17.    RAUL told the UC that he was going to go get the firearms to sell to the UC. They

3   agreed to do the firearm deal the next day. The meeting ended and RAUL and JAVIER

4   HERNANDEZ-GODINEZ drove off.

5       The September 7, 2011, Delivery of Five Guns By JAVIER and JORGE
        HERNANDEZ-GODINEZ

6

7       18.    On September 7, 2011 at approximately 10 a.m., the informant contacted JAVIER

8   HERNANDEZ-GODINEZ to confirm the firearm deal for a time after 4 p.m. The informant

9   later told JAVIER HERNANDEZ-GODINEZ that he was staying at the Travelodge motel in

10  Fife, and it was agreed that the firearms would be brought there.

11      19.    In preparation for the controlled buy, myself and other agents met with the

12  informant in Room 100 at the Travelodge located at 3518 East Pacific Hwy, Fife, Washington.

13  We searched the informant and the room for drugs, money and weapons, and found nothing. We

14  gave the informant a recorder and put audio and video recorders in the hotel room. We gave the

15  informant $2,300 in buy money. We then left the room but kept it under constant surveillance.

16      20.    According to the informant, while he was waiting in his room, JAVIER

17  HERNANDEZ-GODINEZ called him twice to say that he was on his way.

18      21.    At roughly 4:10 p.m., I saw a green 1996 Honda Civic with Washington license

19  plate number 832WAS, arrive at the Travelodge and park about six doors away from Room 100.

20  My investigation has shown that the 1996 Civic is registered to JORGE

21  HERNANDEZ-GODINEZ at 831 East 47th Street in Tacoma -- the same address that is on

22  JAVIER HERNANDEZ-GODINEZ's driver's license.

23      22.    I saw two men whom I later identified as JAVIER and JORGE HERNANDEZ-

24  GODINEZ get out of the 1996 Civic and go into the informant's room. I identified both men

25  from their driver's license photos (in JAVIER's case, I also used a booking photo). JAVIER

26  HERNANDEZ-GODINEZ carried a backpack into the room.

27      23.    I have watched the video of the meeting in the room. JAVIER

28  HERNANDEZ-GODINEZ dumped the backpack on the bed and emptied out five firearms,

    magazines, and ammunition. The informant paid JAVIER HERNANDEZ-GODINEZ, who gave

Complaint/HERNANDEZ-GODINEZ et al. - 8

1   the money to JORGE HERNANDEZ-GODINEZ to count. JORGE HERNANDEZ-GODINEZ

2   counted the money on the bed next to the guns. JORGE HERNANDEZ-GODINEZ also

3   physically handled several of the guns. Once he was done counting the money, he handed it

4   back to JAVIER HERNANDEZ-GODINEZ.

5          24.    According to the informant, JAVIER HERNANDEZ-GODINEZ then talked about

6   selling two AK-47 assault rifles and an SKS assault rifle that had a switch to convert it to fully-

7   automatic. The meeting ended shortly after that.

8          25.    At roughly 4:14 p.m., I saw JAVIER and JORGE HERNANDEZ-GODINEZ leave

9   the informant's room and drive off in the Civic.

10         26.    We went into the room and collected the firearms, which were: a Colt Woodsman

11  .22 caliber pistol bearing serial number 082301S; a Smith & Wesson .38 Special caliber revolver

12  bearing serial number D669542; two Glock Model 22 .40 caliber pistols bearing serial numbers

13  EHF563US and EHF253US; a Smith & Wesson Model 469 9mm caliber pistol bearing serial

14  number TAA0994, along with 96 rounds of ammunition.

15         The Dispute Over Payment Between RAUL And "Carlos"

16         27.    As discussed above, the informant was introduced to RAUL through RAUL's

17  criminal associate, "Carlos." According to the informant, after the deals on September 6th and

18  7th, Carlos complained to the informant over the phone that he had not been paid his share from

19  the firearm sales. The informant told Carlos that the UC had paid RAUL directly, and that

20  Carlos' cut should have been factored into the sale price set by RAUL. Carlos told the informant

21  to just deal directly with RAUL from that point on. The informant then called a man known

22  only as "Perriente," an associate of Carlos' and the man who had initially introduced the

23  informant to Carlos. The informant told Perriente that he was caught in the middle of a dispute

24  between Carlos and RAUL. According to the informant, Perriente told him not to worry about

25  the dispute, and to just make sure to tell Perriente what things he bought, how much he bought,

26  and who he bought it from (presumably so Perriente could impose a "tax" on the seller).

27

28

Complaint/HERNANDEZ-GODINEZ et al. - 9

The September 14, 2011, Sale Of Three Guns By JORGE And JAVIER HERNANDEZ-GODINEZ

28.     According to the informant, during phone conversations, RAUL offered to sell the UC a fully-automatic .308 caliber machine gun with a drum magazine and a fully-automatic AK-47 assault rifle. RAUL's total price was $3,000. The informant and RAUL set up the deal for the afternoon of September 14, 2011.

29.     According to the informant, on September 14th, the day of the deal had been set for, RAUL called the informant and said that he had a third fully-automatic assault rifle for sale. According to the informant, JAVIER HERNANDEZ-GODINEZ called the informant and said that he was going to get the firearms and would be in touch later to give the UC the location for the deal. Shortly after 6:00 p.m. on the that day, the UC received a text message from JAVIER HERNANDEZ-GODINEZ of his address 831 East 47th Street in Tacoma.

30.     The UC, with the informant as his passenger, drove to the East 47th Street address. When they got close to the house, the informant called JAVIER HERNANDEZ-GODINEZ. JAVIER HERNANDEZ-GODINEZ then appeared driving the 2001 Suburban, with JORGE HERNANDEZ-GODINEZ as his passenger. JAVIER HERNANDEZ-GODINEZ pulled in front of the UC's car and led the UC down a back alleyway that gave access to a rear driveway and open-air garage at the 47th Street address.

31.     JORGE and JAVIER HERNANDEZ-GODINEZ got out of the Suburban and led the UC and the informant to a corner of the garage. There were two gun cases in the corner. JAVIER HERNANDEZ-GODINEZ opened the cases and showed the UC the following firearms: an FN .308 caliber rifle, bearing serial number 10109; an SWD, 9mm M-11 pistol, bearing serial number 86-080591; and a Russian .762 caliber SKS-45 rifle, bearing serial number RH000760. The UC examined the firearms and saw that none of them were fully-automatic. The UC explained to JAVIER HERNANDEZ-GODINEZ that the firearms were not fully-automatic. JAVIER HERNANDEZ-GODINEZ insisted that the firearms were full-auto. The UC convinced JAVIER HERNANDEZ-GODINEZ to produce his personal firearm so that the UC could make a demonstration. JAVIER HERNANDEZ-GODINEZ then

Complaint/HERNANDEZ-GODINEZ et al. - 10

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  produced a Glock .45 caliber pistol, unloaded it, and gave it to the UC. The UC then showed

2  JAVIER HERNANDEZ-GODINEZ how the semi-automatic Glock and the supposedly fully-

3  automatic firearms made similar sounds when the firearms were cocked and the trigger was

4  pulled. The UC tried to buy the Glock .45 but JAVIER HERNANDEZ-GODINEZ refused to

5  sell it. The UC returned the Glock .45 and JAVIER HERNANDEZ-GODINEZ reloaded it and

6  placed it in his waistband behind his back. Throughout this time, JORGE

7  HERNANDEZ-GODINEZ spoke only occasionally and kept watch over the UC and the

8  informant.

9       32.    JAVIER HERNANDEZ-GODINEZ then made a phone call to RAUL. JAVIER

10  HERNANDEZ-GODINEZ told the UC that RAUL had already paid for the firearms and that he

11  stood to lose money if he lowered the price. After some negotiation, the UC, JAVIER

12  HERNANDEZ-GODINEZ and RAUL (by phone) agreed to sell the three firearms for $3,200.

13  The UC attempted to get JAVIER HERNANDEZ-GODINEZ to throw in some

14  methamphetamine to make up for the high cost of the firearms. JAVIER HERNANDEZ-

15  GODINEZ told the UC that he could get the methamphetamine but that it had to be from

16  somewhere else. JAVIER HERNANDEZ-GODINEZ said that they were already out and RAUL

17  was already on his way back to Washington from California. The UC and JAVIER

18  HERNANDEZ-GODINEZ agreed that since the three firearms was so expensive, the UC would

19  get a better deal on future purchases of methamphetamine. The UC paid JAVIER

20  HERNANDEZ-GODINEZ the $3,000 he had on his person for the firearms. JAVIER

21  HERNANDEZ-GODINEZ did not have the drum magazine for the .308 caliber rifle, and it was

22  agreed that the UC would get the drum magazine later when he returned with the $200 balance

23  he owed.

24       The November 16, 2011, Delivery Of Ten Guns

25       33.    On November 16, 2011, at approximately 4:30 p.m., the UC met with JAVIER

26  HERNANDEZ-GODINEZ at the 47th Street address in anticipation of a meeting with the "white

27  lady" who supplied the firearms. Prior to the deal, the UC had several recorded phone

28  conversations with JAVIER HERNANDEZ-GODINEZ during two unsuccessful attempts at

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  meeting with the "white lady." JAVIER HERNANDEZ-GODINEZ had told the UC that a man

2  named "Ricky" would help to arrange a meeting with the white lady. JAVIER HERNANDEZ-

3  GODINEZ had put the UC in touch with "Ricky" by phone, and the UC and "Ricky" had

4  communicated and discussed a firearms deal. The UC expected to meet "Ricky" on the day of

5  the November 16, 2011, gun deal.

6       34.     Before the UC met with "Ricky" that day, in an open air car port at the back of the

7  47th Street address, JAVIER HERNANDEZ-GODINEZ showed the UC a PWA, .556 caliber,

8  model Commando, assault rifle, Serial No. 13733. JORGE HERNANDEZ-GODINEZ was also

9  present. JAVIER HERNANDEZ-GODINEZ explained that the Commando rifle had a pin

10 missing in the receiver. Upon inspecting the firearm the UC noticed that the hole where the pin

11 should have been had a plastic zip tie strung through it. The UC field tested the firearm and it

12 appeared to be a fully functioning semi-automatic assault rifle even without the missing pin.

13      35.     Shortly after inspecting the firearm, the UC met "Ricky," aka "Enrique" whose full

14 name is JESUS ENRIQUE PALOMERA, in the garage area. The UC has identified

15 PALOMERA from his driver's license photo.

16      36.     PALOMERA told the UC that the Commando rifle was his, but that he wasn't sure

17 if he wanted to sell it . PALOMERA said he might need the rifle because a guy owed him some

18 money. PALOMERA, laughing, then racked the empty firearm, pointed it in the UC's direction,

19 but not at the UC, and pulled the trigger. There was no round in the chamber and the gun did not

20 fire.

21      37.     PALOMERA and the UC then started talking about narcotics sales. The UC and

22 the informant had heard from RAUL and JAVIER HERNANDEZ-GODINEZ that PALOMERA

23 sold drugs with them. PALOMERA told the UC that he used to come to Tacoma to "re-up"

24 several times a week, buying two to three pounds at a time.

25      38.     The UC and PALOMERA then started to talk about drug deals gone bad.

26 PALOMERA told the UC about several deals where he had been ripped off. PALOMERA told

27 the UC that a man had once robed him at gunpoint and taken a pound of methamphetamine.

28 After the robbery, PALOMERA called a friend also known as "Ricky" and told him about the

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    robbery. This other "Ricky" later called PALOMERA back and said that he had recovered the

2    stolen methamphetamine. PALOMERA went to Ricky's house to get the drugs back. In the

3    house, PALOMERA saw the body of the robber, wrapped in plastic bags. Ricky told

4    PALOMERA that he would dump the body in a river.

5        39.    PALOMERA said that he and JORGE HERNANDEZ-GODINEZ had illegally

6    crossed the Mexican border about six months earlier. PALOMERA said that he paid a "coyote"

7    $6,000 to get across the border.

8        40.    PALOMERA called the "white lady" several times in front of the UC and

9    explained that she was on her way. PALOMERA told the UC that she was coming from the

10   Hilltop area of Tacoma.

11       41.    The UC asked PALOMERA what the "white lady" had for sale. PALOMERA

12   said that she had an attachment that goes onto the end of a military assault rifle and shoots an

13   explosive. PALOMERA said that the white lady could get regular grenades as well.

14       42.    After approximately an hour and ten minutes, PALOMERA said that the white

15   lady was close, but that he needed to meet somebody at a store. PALOMERA asked the UC if

16   he wanted the Commando assault rifle. The UC bought the Commando rifle for $600. JORGE

17   HERNANDEZ-GODINEZ helped the UC pack up the firearm, gave the UC a bag of 162 bullets

18   (including 36 rounds of Remington .380 auto ammunition), and helped him put the firearm in the

19   trunk of his car.

20       43.    Shortly after that, PALOMERA and JORGE HERNANDEZ-GODINEZ drove off

21   in a silver Mazda sedan with Washington license plate number 244-ZN or 244-ZJ. The UC was

22   not sure what the last digit was.

23       44.    The UC then met again with JAVIER HERNANDEZ-GODINEZ, and the two

24   men went inside the 47th Street address. JAVIER HERNANDEZ-GODINEZ's wife and two

25   small children were in the house. The UC and JAVIER HERNANDEZ-GODINEZ waited for

26   the white lady.

27       45.    About eighteen minutes later, the white lady and another white woman, AMBER

28   YEHLE, entered the house through the alley entrance. The UC has identified YEHLE from her

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  driver's license photo.  JAVIER HERNANDEZ-GODINEZ was carrying a blue gymbag as he
2  returned from showing the two women into the house.  YEHLE carried a long black rifle case.
3  JAVIER HERNANDEZ-GODINEZ's wife escorted the two children into a bedroom adjacent to
4  the kitchen.  The UC, JAVIER HERNANDEZ-GODINEZ, YEHLE, and the white lady all went
5  into the childrens' room.

6  46.  Once inside the children's bedroom, Amber YEHLE closed the door.  The UC
7  opened the rifle case and the gym bag which contained the following firearms: (1) a Ruger,
8  model Single Six, .22 caliber revolver, bearing serial number 68-85990; (2) an Echasa, model
9  Fast, .380 caliber pistol, bearing serial number 80234; (3) a Taurus, model 94, .22 caliber
10 revolver, bearing serial number 73831; (4) a Marlin, Model 60, .22 caliber rifle, bearing serial
11 number 06225356; (5) a Mossberg, model 500A 12 gauge, pump-action shotgun, bearing serial
12 number K865680; (6) a Mossberg, model 500A 12 gauge, pump-action shotgun, bearing serial
13 number J371412; (7) a Bushmaster, .556 caliber, model Carbon 15, pistol, bearing serial number
14 D05977; and (8) a Ruger, .22 caliber, model 10/22 Carbine, semi-automatic rifle, bearing serial
15 number 232-08350.

16 47.  Upon inspecting the firearms, the UC asked the "white lady" how much she
17 wanted for the firearms.  The "white lady" said that she needed to call "her dude."  The "white
18 lady" then made a phone call, after which she said that "he" wanted $4,500 because of the value
19 of the assault rifle, but that "he" would take $4,000.

20 48.  The UC asked the "white lady" what the deal was with the rockets.  The "white
21 lady" said that "he" could get those but that they didn't want to store them in their place for a
22 long time.  The UC asked about grenades, and the "white lady" said that they could get those as
23 well.  The UC expressed skepticism and the "white lady" told him that the rockets and grenades
24 came from a guy who is in the military.  The "white lady" also stated that the Desert Eagle
25 firearm that the UC bought from RAUL on September 6th -- the first gun that RAUL sold the
26 UC -- actually came from her.

27 49.  The UC then paid the "white lady" $4,000.  Agents saw a black 1996 Nissan
28 Maxima with Washington license plate number AES0878 leave the residence at that time but

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  could not see who was driving. My investigation has shown that the Maxima is registered to

2  YEHLE.

3      50.    The UC then paid JAVIER HERNANDEZ-GODINEZ the $200 that he owed him

4  for the previous firearms deal. The UC and JAVIER HERNANDEZ-GODINEZ then packed up

5  the firearms. While they packed the firearms, JAVIER HERNANDEZ-GODINEZ told the UC

6  that he had a shotgun for sale. The UC and JAVIER HERNANDEZ-GODINEZ walked back to

7  the car port, where JAVIER HERNANDEZ-GODINEZ showed the UC a Mossberg, 12 gauge,

8  model 500A, pump-action shotgun, bearing serial number P327541. The UC offered JAVIER

9  HERNANDEZ-GODINEZ the money he had left in his pocket, $200. JAVIER

10  HERNANDEZ-GODINEZ said that he wanted $250. The UC gave him $200 and said that he

11  would owe him the rest. The UC and JAVIER HERNANDEZ-GODINEZ then took all of the

12  firearms and loaded them into the UC's car. The UC then drove off.

13      Additional Information

14      51.    Records checks show that the Ruger .22 rifle was reported stolen out of Olympia.

15  I also saw that the serial number for the Bushmaster firearm had scratch marks through it but

16  was still readable.

17      52.    As discussed above, I am a certified interstate nexus expert. I have extensive

18  training and experience in identifying firearms and ammunition and determining where they

19  were made. I have examined all of the firearms purchased during this investigation. All of these

20  firearms were made outside of the State of Washington, and all must have traveled in interstate

21  or foreign commerce before reaching the State of Washington. The Glock pistol that JAVIER

22  HERNANDEZ-GODINEZ showed to the UC was also made outside of the State of Washington.

23  All of these firearms are weapons designed to expel a projectile by means of an explosive. The

24  Remington .380 auto ammunition that JORGE HERNANDEZ-GODINEZ loaded into the UC's

25  vehicle was also made outside of the State of Washington.

26      53.    I have also reviewed certified conviction documents for Amber YEHLE, out of the

27  Superior Court of Washington for Pierce County. Documents show she was convicted of

28  Unlawful Possession of a Controlled Substance -- Methamphetamine, on February 23, 2009, in

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  cause 08-0-06043-0.  This crime is a felony offense punishable by over a year of imprisonment.

2       54.    I have reviewed the Washington state driver's license applications for JAVIER

3  HERNANDEZ-GODINEZ, JORGE HERNANDEZ-GODINEZ, and PALOMERA.  All three

4  state that they were born in Mexico.  The applications show that all three gave Mexican

5  identification to get their drivers' licenses.  Furthermore, at my request Homeland Security

6  Investigations ("HSI") SA Galetti checked for all three in applicable HSI databases.  According

7  to SA Galetti all checks were negative, indicating that none of the three had applied for and/or

8  been legally granted admittance into the United States.

9       55.    Based on the foregoing, I respectfully submit there is probable cause to believe

10 that the Defendants committed the crimes charged in Counts 1 through 5, above, incorporated

11 herein by reference.

14                                   LISA SANKS, Complainant
15                                   Special Agent, Bureau of Alcohol, Tobacco, Firearms,
                                     and Explosives

17      Based on the Complaint and Affidavit sworn to before me, and subscribed in my

18 presence, the Court hereby finds that there is probable cause to believe the defendant committed

19 the offense set forth in the Complaint.

20      Sworn to before me and subscribed in my presence, this _17th_ day of February, 2012.

23                                   KAREN L. STROMBOM
24                                   UNITED STATES MAGISTRATE JUDGE

Complaint/HERNANDEZ-GODINEZ et al. - 16

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800